## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ARLETHIA CHAMPION**, ) | |
| 13013 7th Street ) | |
| Bowie, MD 20720 ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. _____ |
| ) | |
| **UNITED STATES CONFERENCE OF** ) | |
| **CATHOLIC BISHOPS (USCCB)**, ) | |
| 3211 Fourth Street, NE ) | |
| Washington, DC 20017-1194 ) | |
| ) | |
| Defendant. ) | |

## COMPLAINT

Plaintiff Arlethia Champion ("Plaintiff" or "Ms. Champion"), by and through undersigned counsel, respectfully comes before this Honorable Court to submit the following Complaint against Defendant United States Conference of Catholic Bishops ("Defendant" or "USCCB") for *racial discrimination / hostile work environment, denial of family and medical leave, denial of vacation time, nonpayment of overtime wages, workplace bullying and retaliation, wrongful termination and violation of privacy (medical information).* Ms. Champion files this civil action in good faith and as matter of federal law, seeking damages in the amount of $3,000,000 ($3M) USD.

## JURISDICTION

This Honorable Court has federal-question jurisdiction to hear cases involving violations of the U.S. Constitution or federal laws. Ms. Champion claims that Defendant violated the

Fourteenth Amendment to the U.S. Constitution, U. S. Const. amend. XIV; Title VII of The Civil

Rights Act of 1964 (Title VII), 42 U.S.C. § 2000d *et seq*.; the Whistleblower Protection Act of

1989 (WPA), 5 U.S.C. 2302(b)(8)-(9), Pub.L. 101-12 as amended; Fair Labor Standards Act of

1938 (FLSA), 29 U.S.C. § 203; the Family Medical Leave Act of 1993 (FMLA), 29 U.S.C. §

2601; D.C. Family Medical Leave Act (DCFMLA); Parental Leave Act of 1994, D.C. Code Ann.

§§ 32-521 *et seq*., and the Health Insurance Portability and Accountability Act of 1996, as

amended ("HIPAA Privacy Rule"), Public Law 104 - 191, 45 U.S.C. § 300gg and 29 U.S.C. §

1181 *et seq*. and 42 U.S.C. 1320d *et seq*.  Thus, the federal question jurisdiction requirement has

been satisfied in this case.

Furthermore, this Honorable Court has diversity jurisdiction to hear cases between

citizens of different states if the amount in controversy exceeds $75,000.  In this case, Ms.

Champion is a natural born, citizen of the United States of America and a law abiding citizen of

Bowie, Maryland.  USCCB is a 501(c)(3) tax-exempt organization (EIN 53-0196617)[1] that, "is

organized as a non-profit corporation in the District of Columbia."[2]  Thus, Ms. Champion and

USCCB are citizens of different states.  The amount in controversy is $3M USD.  Thus, the

diversity jurisdiction requirements have been satisfied in this case.

### SUMMARY OF MATERIAL FACTS

USCCB is a 501(c)(3) charitable corporation.  Section 501(c)(3) is the portion of the

Internal Revenue Service ("IRS") Code that allows for federal tax exemption of nonprofit

organizations, specifically those that are considered public charities, private foundations or

---

[1] Curiously, USCCB has the same EIN as Saint Cecilia Church which is located at 3105 Madison Road, Cincinnati, OH.

[2] *See* http://www.usccb.org/about/.

private operating foundations, such as USCCB.  USCCB's online publication states that it

"organizes and conducts religious, *charitable* and social welfare work at home and abroad; to aid

in education; [and] to care for immigrants."[3]

According to USCCB, "The purpose of the Conference is to promote the greater good

which the Church offers humankind...."[4] However, Ms. Champion claims that USCCB failed to

demonstrate the spirit of its religious purpose towards her during the two (2) year period of

employment when USCCB employees in positions of authority violated Ms. Champion's rights

as protected pursuant to the U.S. Constitution, federal and local statutes, and the Internal

Revenue Service Code.  Ms. Champion claims that Defendant's conduct towards her is indicative

of the Catholic Church's long standing history and involvement in slavery, racial discrimination

and sexual abuse of women and minors in the United States (and abroad), which is common

knowledge.

Plaintiff Ms. Champion is a black, African-American, single mother of two children.  She

worked as a full-time employee of USCCB in the position of Accounts Payable Clerk ("AP

Clerk") for two (2) years (October 2016 to November 2018).[5]  Ms. Champion began her two year

tenure at USCCB as a temporary employee from October 2016 until February 2017.  Ms.

Champion acknowledges that she was an "at-will" employee.  However, Ms. Champion claims

that federal and state labor laws prohibits Defendant from violating Ms. Champion's civil rights

---

[3] *See id.*

[4] *See id.*

[5] On November 8, 2018, when Ms. Champion arrived at the security gate to obtain entry into the USCB building during normal work hours, she found that her badge had been deactivated and was denied access in the presence of her co-workers.  A USCCB security guard notified her inquiries to Mr. Andrew Davis of USCCB's Office of Human Resources.   The next day, on November 9, 2018, USCCB transmitted a Letter of Termination to Ms. Champion via electronic mail (e-mail) giving notice that her termination would be effective November 13, 2018.

as an "at-will" employee.  Furthermore, Defendant must also comply with all federal and local labor laws, as applicable to "at-will" employees, such as Ms. Champion.

According to Ms. Champion, Defendant informed her that she, as a temporary employee, would be trained by Accounts Payable (AP) Clerk, Andrew Martin ("Mr. Martin") (now resigned).  However, Mr. Martin had health conditions which limited his ability to come into the office, which left Ms. Champion to, "figure things out on [her] own."  Furthermore, no other employee in Defendant's Accounting Department, including the Accounting Manager (resigned), Michelle Harmon ("Ms. Harmon"), was knowledgeable enough about the AP process and system to train Ms. Champion. Thus, Defendant never provided Ms. Champion with "official" training for the AP Clerk position which she reasonably claims was needed for her to effectively perform her duties as described in her new position.

In response to Ms. Champion's claims, Defendant *may* argue that Ms. Champion experienced performance issues shortly after she was hired as a full-time, AP Clerk and had challenges meeting expectations and deadlines (arguably unreasonable in light of the facts in this case) which ultimately resulted in the implementation of a Performance Improvement Plan (PIP) in September 2018.  However, when Defendant *offered* Ms. Champion the full-time, AP Clerk position in February 2017, Ms. Champion *accepted* the offer and executed an employment contract with USCCB.  Thus, Defendant had a *fiduciary duty to train* Ms. Champion in her *new position*.  Defendant *breached* its duty to Ms. Champion when if *failed to train* her as agreed. Thus, it is reasonable to infer (if Defendant's prospective arguments are true) that any challenges or deficiencies that Ms. Champion *may* have experienced would reasonably be attributed to Defendant's *breach of duty* to train Ms. Champion.  Therefore, Ms. Champion claims that

Defendant's breach of duty is the direct (or indirect) *cause* of any performance deficiencies that she *may* have experienced as a USCCB employee, and Defendant is responsible (in whole or in part) for creating workplace environment which either "set up" Ms. Champion for failure from the start of her employment or allowed Defendant to create an excuse of "poor performance" to justify the termination of Ms. Champion's employment in the face of her EEO complaint.[6]

Ms. Champion claims that when she was both a temporary and full-time AP Clerk, Defendant routinely required her to work "off the clock" to maintain and manage her workload.[7] Thus, Ms. Champion was routinely required to work several hours after 4:00 p.m. on weekdays, several hours on weekends and during her lunch hour throughout the week - all without compensation - in order to achieve her expected weekly performance goals, which were unreasonable and unrealistic under the circumstances surrounding her hire.[8]

Defendant *may* argue that Ms. Champion worked additional hours without authorization and that she was repeatedly told not to do so.  However, Ms. Champion claims that any prospective arguments to that effect would be disingenuous since she would notify her direct supervisor, Accounting Manager Katiria Rodriguez ("Ms. Rodriguez") (light-skinned, Hispanic), about her need to continue working in order to complete assigned work and meet daily performance goals (created and monitored by Controller Karen Acton ("Ms. Acton") (white, Caucasian) and Accounting Manager Ms. Rodriguez).[9]

---

[6] Defendant disingenuously used "performance issues" as the "reason" for terminating Ms. Champion's employment in November 2018.

[7] Defendant contracted Ms. Champion to work a thirty-five (35) hour work week, Monday through Friday from 8:00 a.m. to 4:00 p.m. with a one (1) hour, un-paid lunch break, instead of a forty (40) hour work schedule.

[8] Ms. Champion claims that, "sometimes [she] stayed at the office and other times [she] would work from home remotely logging into the AP system.

[9] Ms. Rodriguez was Ms. Harmon's replacement.

Interestingly, Defendant did not adjust Ms. Champion's work schedule in consideration of her obviously extensive workload, lack of training, and consistent need to work overtime hours.[10]  Finally, Ms. Champion claims that in January 2018, when both Ms. Harmon and Ms. Rosalyn Unalivia, Controller of USCCB, simultaneously departed as employees of USCCB, a backlog of work resulted which fell on Ms. Champion's shoulders to bear with very little assistance.  Ms. Harmon departed without having performed Ms. Champion's annual performance review.  Thus in February 2018, Mrs. Jones completed the performance review, without having a day-to-day, direct supervision, but admitting that Ms. Champion had a "challenging year" for a "myriad of reasons."  However, Mrs. Jones did not give any further details.  Defendant *may* argue that Mrs. Jones' references to Ms. Champion's "challenging year" during Ms. Champion's performance evaluation is due to some fault of Ms. Champion. However,

It was not until late February 2018 that Mrs. Joyce Jones, USCCB Chief Financial Officer, promoted Karen Acton who was the Director of the Budgeting Department to the vacant position of Controller of the Accounting Department.  Mrs. Jones also promoted Ms. Rodriguez to the position of Assistant Controller to replace Ms. Harmon.  Soon thereafter, on March 15, 2018, Ms. Champion began to experience scheduling issues and pressure from Ms. Acton and Ms. Rodriguez regarding *previously approved* vacation leave (March 16 - 29, 2018 and April 2, 2018).

On March 15, 2018, the day before the start of her vacation, Ms. Champion claims that Ms. Acton and Ms. Rodriguez approached her and *demanded* that they meet to discuss her

---

[10] Defendant knew or had reason to know that without a schedule adjustment, Ms. Champion would need to work hours above and beyond thirty five (35) hours per week in order to keep pace with USSCB's demand for timely processing of numerous daily invoices and weekly payroll for over three hundred (300) employees.

vacation schedule.   During the meeting, Ms. Acton and Ms. Rodriguez informed Ms. Champion

that she would <u>have to change her vacation schedule</u> "because it [the workload] would be a lot

[for them] to do...check run and end of month close," if Ms. Champion was not at work to

perform those tasks.   Ms. Champion did not want to cancel her vacation plans.   However, she felt

coerced to comply with the demands of Ms. Acton and Ms. Rodriguez in order to keep her job;

Ms. Champion believed that she would be "fired" if she did otherwise because Ms. Acton stated,

"It's time for our monthly staff meeting and will address concerns about vacation...."   In

addition, Ms. Acton immediately imposed new responsibilities and unreasonable deadlines

without considering the backlog of work created by "one person [Ms. Champion] doing a two

person job."

Ms. Champion claims that in July of 2018, Ms. Acton, again, pressured her into altering

her scheduled leave time.   Specifically, as Ms. Champion was gathering her personal belongings

to leave work for a scheduled medical appointment, Ms. Acton approached Ms. Champion's

cubicle and inquired about the severity of Ms. Champion's medical status, asking "Is it an

emergency?   Do you have to leave?" [11]   In so doing, Ms. Acton violated Ms. Champion's

HIPAA Privacy rights.   Ms. Champion claims that she was extremely upset, so much so that she

immediately headed over to Mrs. Jones' office to report Ms. Acton's invasion of her medical

privacy and harassment about taking time off to go to a doctor's appointment.   She initially

spoke to Mrs. Jones' administrative assistant, Tryone Jackson ("Mr. Jackson"), inquiring about

Ms. Jones' whereabouts and explained her troubling encounter with Ms. Acton when he inquired

about her wellbeing.   Ms. Champion claims that Ms. Acton followed her into Mr. Jackson's

---

[11] Ms. Champion's leave request to go to her medical appointment had already been approved by her direct
supervisor, Ms. Rodriguez.

office, closed the door behind her (thereby preventing other employees from hearing and seeing

Ms. Acton's intrusion into the *private conversation* between Ms. Champion and Mr. Jackson) and

rebuked Ms. Champion by stating, "You have no reason to be upset about what I asked you."  In

response to what Ms. Champion viewed as "aggressive and threatening behavior," Ms.

Champion claims that she left Mr. Jackson's office and waited at her desk for Mrs. Jones' return

so that she could *officially report* the incident up the chain of command.

Ms. Champion claims that she was extremely uncomfortable by Ms. Acton's intrusion

into her private conversation with Mr. Jackson and closure of the office door upon her entry into

Mr. Jackson's office.  Ms. Champion was also concerned about the security of her job as a result

of Ms. Acton's aggression and harassment.  Upon Mrs. Jones' return to her office, Ms. Champion

immediately informed Mrs. Jones about Ms. Acton's harassment and invasion of privacy.

However, instead of reporting Ms. Acton to the Human Resources Department as she was

required to do by law and USCCB's Personnel Policy and Procedures Manual, Mrs. Jones simply

responded by saying, "[T]here was a breakdown in communication."

Finally, Ms. Champion claims that after that after this incident, Ms. Acton continued to

increasingly create a hostile work environment for her to work in by *manufacturing* complaints

about her work performance, issuing performance improvement plans containing misinformation

about Ms. Champions alleged deficiencies, refusing to correct the acknowledged misinformation,

and soliciting the cooperation of Ms. Champion's direct supervisor (Ms. Rodriguez) in

verbalizing and documenting those complaints.   Ms. Champion claims that Ms. Acton

eventually ostracized Ms. Champion and fired her under the guise of "poor performance," only

after Ms. Champion complained about her hostile work conditions during an open staff meeting

and attempted to file an EEOC complaint against Ms. Acton in house and at the U.S. Equal

Employment Opportunity Commission (EEOC) in Washington, DC.

## CLAIM 1

### 1.  Defendant Retaliated Against Plaintiff For Participating in Whistleblower Activity

Ms. Champion claims that workplace hostilities began in February 2017 after she

discovered, upon review of a payment schedule, a gross discrepancy in a wire transfer for

payment and reported it to Joyce Jones ("Mrs. Jones" or "CFO") who was, and still is, the Chief

Financial Officer (CFO) of USCCB.  Specifically, the discrepancy was a *$1.4M repeat wire*

*transfer payment to an international "vendor"* which was initiated (twice) by Michelle Harmon.

("Ms. Harmon"), Ms. Champion's former Accounting Manager, and approved and paid (twice)

by Rosalind Unalivia ("Ms. Unalivia"), former Controller and close friend of Ms. Acton.  Ms.

Acton is the current Controller.  Ms. Harmon and Ms. Unalivia have since resigned, both on the

same day in January 2018.  Thus, Ms. Champion is a whistleblower and has suffered retaliation

by USCCB ever since.  Interestingly, the USCCB Personnel Policies and Procedures Manual

does not provide guidelines, instructions, local rules or employee rights pertaining to whistle-

blowing activity.

According to the IRS Code, "[T]he organization must not be organized or operated for the

benefit of private interest, and no part of a section 501(c)(3) organization's net earnings may

inure to the benefit of any private shareholder or individual.  If the organization engages in an

*excess benefit transaction with a person having substantial influence over the organization*, an

excise tax may be imposed on the person and any organization managers agreeing to the

transaction, (emphasis added)."  The aforementioned unlawful payment of $1.4M to an

international "vendor" is an excess benefit to that individual or entity in violation of the IRS

Code.   In addition, USCCB's bi-annual payment of $500,000.000 USD (total of $1M) to Pope

Francis, who clearly has *substantial influence over* USCCB, can also be seen as a violation of the

Internal Revenue Service Code.

Ms. Champion reported the $1.4M "excess benefit transaction" to the CFO of USCCB,

Mrs. Jones, who allegedly conducted an "in-house" inquiry.  Ms. Champion claims that

immediately after participating in this whistleblower activity, Ms. Unalivia began bullying her in

the workplace and Ms. Harmon began to document fallacious complaints against Ms. Champion

relating to her work performance.  Ms. Champion complained up the chain of command to Mrs.

Jones who recommended that Ms. Champion "take [her] concerns to HR [Human Resources]"

since Ms. Unalivia had a past history of complaints to HR regarding the bullying of subordinate

employees.

Ms. Champion complied with Mrs. Jones' recommendation and lodged a verbal

complaint of workplace bullying against Ms. Unalivia with Andrew Davis ("Mr. Davis"), HR

Generalist.  An informal investigation was allegedly conducted by Mr. Davis.  However, Ms.

Champion was not provided with any written documentation of her complaint or the final

resolution thereof.

## CLAIM 2

## 2(a).  Defendant's Misconduct and Maltreatment of Plaintiff Created A Hostile Work Environment

_____

Ms. Acton (white, Caucasian), in retaliation against Ms. Champion (black, African-American) AP Clerk for filing an HR complaint against her close friend (and work colleague), ceased all communication with Ms. Champion.  This abrupt change in behavioral pattern led Ms. Champion to believe that Ms. Acton knew, or had reason to know, about Ms. Champion's HR complaint against Ms. Unalivia, and thereby took offense to Ms. Champion's whistleblower activity.

Four (4) months after Ms. Unalivia's resignation from USCCB as Controller, Ms. Acton was assigned to the position of Acting Controller and later promoted to Controller by the CFO, Mrs. Jones.  USCCB's placement of Ms. Unalivia's close friend, Ms. Acton, into a position of authority over Ms. Champion, resulted in a transference (by association) of hostility towards Ms. Champion, a whistleblower of Ms. Unalivia's apparent fraud, waste and abuse.  Thus, Ms. Acton did not start her new position with a "clean slate," as it relates to Ms. Champion.

Ms. Champion claims that Ms. Acton has subjected Ms. Champion to harassment and ridicule resulting in Ms. Champion's development of hypertension (high blood pressure) and exacerbation of diabetes (high blood sugar), anxiety, panic attacks, and depression.  Ms Champion claims that USCCB's hostile work environment has negatively impacted her physical, psychological, and emotional well-being, the details of which are clearly documented in her official medical records.  Thus, USCCB is liable for Ms. Champion's damages.

Furthermore, Ms. Champion claims that Mrs. Jones, while having the authority and responsibility as CFO, did not intervene to address Ms. Acton's retaliation, harassment and workplace bullying despite having actual knowledge of the hostile work environment.  Thus, Ms. Champion claims that Mrs. Jones is responsible for the negligent supervision of a subordinate

whom she placed in a position of authority over Ms. Champion knowing the history of Ms.

Champion's aforementioned whistleblower activity.

According to USCCB Personnel Policies and Procedures Manual, Policy #2-B (Non-

Discrimination and Harassment), Section 2- *Responsibilities of Employees and Supervisors*

("Policy #2-B"), "Any supervisor receiving a complaint or report of harassment must consult

immediately with the Office of Human Resources.  The supervisor hearing such a complaint or

report, even third hand, has an obligation to consult with Human Resources immediately whether

or not the supervisor has any management responsibility over the accused wrongdoer or the

person subjected to potential wrongdoing.  In addition, supervisors have an obligation to prevent

and, in consultation with Human Resources, promptly to redress any occurrence of harassment

involving employees under their supervision."  Ms. Champion claims that Mrs. Jones failed to

adhere to USCCB's workplace policy and procedures and thereby abdicated the responsibilities

of her position as Ms. Champion's second line supervisor.

## 2(b).  USCCB's Hostile Work Environment Negatively Impacted Plaintiff's Health And Ability To Perform Work Duties As Demanded Without Fear of Reprisal

Ms. Champion claims that on, or about, July 2018, she became aware of the unauthorized

use of a USCCB Bank of America credit card by the CFO, Mrs. Jones, to make a personal

purchase (i.e. plane tickets for her and her husband to visit their two children who were away at

college).  Ms Champion claims that the CFO's use of the USCCB credit card to make a personal,

non-business purchase was a misappropriation of USCCB's funds (fraud, waste and abuse) in

violation of IRS Code.

Specifically, according to the IRS exemption requirements of 501(c)(3) organizations,

"[T]o be tax-exempt under section 501(c)(3) of the Internal Revenue Service Code, an

organization must be organized and operated exclusively for exempt purposes set forth in section 501(c)(3), and *none of its earnings may inure to any private shareholder or individual*...[T]he organization must not be organized or operated for the benefit of private interests, and *no part of a section 501(c)(3) organization's net earnings may inure to the benefit of any private shareholder or individual. If the organization engages in an excess benefit transaction with a person having substantial influence over the organization, an excise tax may be imposed on the person and any organization managers agreeing to the transaction*," (emphasis added).

Thus, USCCB, by virtue of the actions of its current CFO, Mrs. Jones, and its former Controller and Accounting Manager, Ms. Unalivia and Ms. Harmon, respectively, failed to adhere to the requirements of the IRS Code and is subject to the penalty of an excise tax.  In addition, USCCB is also subject to any court awarded penalty for retaliating against Ms. Champion, the employee whistleblower who exposed the USCCB's IRS Code violation.

## 2c. Fear and Intimidation - Hostile Work Environment

Ms. Champion further claims that she was fearful and intimidated about commenting or reporting the aforementioned unauthorized financial activities because of: 1) Mrs. Jones' power and position as CFO of USCCB; 2) Mrs. Jones' use of USCCB's credit card (misappropriation of funds) without penalty or reprimand; 3) the hostility she had experienced under the supervision of Ms. Harmon and Ms. Unalivia which was supported by Mrs. Jones; [12] 4) the continued hostility experienced under the supervision of Ms. Acton,who replaced her friend, Ms. Unalivia, in the position of Controller in May 2018 by Mrs. Jones; 5) her failing health due to the daily

---

[12] Allegedly, in January 2018, Ms. Harmon and Ms. Unalivia resigned (under pressure) from their supervisory positions at USCCB due to their participation in fraud and financial improprieties.

pressured and harassing environment allowed by Mrs. Jones; and 6) fear of being terminated either by Mrs. Jones (or Ms. Acton).

Ms. Champion's fears and concerns were reasonable given the fact that four months later, on November 9, 2018, USCCB terminated her employment (without notice) on false claims of "poor work performance" and "unauthorized access to the building," both of which are tactics commonly used against whistleblowers by employers who desire to retaliate against, or remove, the whistleblower from the work setting. A careful review of Ms. Champion's evidentiary documents will clearly demonstrate that USCCB's grounds for terminating Ms. Champion are contrived and based upon the fabrication and manipulation of facts. [13]

## COUNT 3

### 3.  Defendant Denied Plaintiff The Financial Benefit Of Overtime Wages In Violation of Federal and Local Labor Laws

Ms. Champion claims that Ms. Acton's hostilities and harassment against her escalated on September 14, 2018, when Ms. Champion complained about workplace conditions during a staff meeting wherein she mentioned issues of denial of family leave time, severely restricted vacation time, pressure not to take sick leave, and unpaid work hours. Ms. Champion further claims that she has the least amount of formal education in her department and is the only employee there who is compensated for her labor on an hourly basis (non-salary). Ms. Champion's ability to schedule vacation time and leave was unreasonably and severely restricted by her supervisors.

## COUNT 4

### 4(a).  Defendant's Retaliation/Reprisal Against Plaintiff - Accusation of Poor Performance and Presentation of a Performance Improvement Plan (PIP)

---

[13] Plaintiff's concerns and fears of workplace reprisal for being a whistleblower have been proven to be reasonable; On November 9, 2018, Ms. Champion received a Letter Of Termination from Defendant USCCB stating that the effective date of her termination would be November 13, 2018.

On September 26, 2018, less than two weeks after the aforementioned staff meeting, Ms. Acton presented Ms. Champion with a lengthy Performance Improvement Plan (PIP), the contents of which contained inaccurate information and severely restricted Ms. Champion ability to complete her day to day tasks.  During the PIP discussion meeting, Ms. Champion: 1) questioned the veracity and accuracy of the information contained therein; 2) directed Ms. Acton's attention to the errors contained therein; and 3) refrained from signing the PIP, as written, until the agreed upon errors were corrected.

Ms. Acton did not provide Ms. Champion with an amended PIP, neither was Ms. Champion provided with evidence of alleged poor performance which Ms. Acton claimed were "pulled from reports" of API processing activity.  Ms. Champion claims that these "reports" were never referred to during the PIP discussion meeting, nor were these "reports" furnished for Ms. Champion's review, analysis and confirmation.  Thus, a mutually agreed upon and fully executed PIP does not exist to which Ms. Acton could hold Ms. Champion responsible.  Furthermore, evidence of Ms. Champion's alleged "poor performance," which Ms. Acton and Ms. Rodriguez claimed were verified by "reports," do not appear to exist.

Ms. Champion became suspicious and grew concerned about Ms. Acton's surreptitious production of the erroneous September PIP (without providing supporting evidence) because Ms. Champion's direct supervisor, never complained about Ms. Champion's performance or work schedule prior to the PIP meeting.  In fact, on February 9, 2018, Mrs. Jones conducted Ms. Champion's performance appraisal based upon personal "knowledge of the performance of the day to day tasks," and determined that Ms. Champion's "performance during the period of evaluation met expectations."

**4(b). Defendant's Retaliation/Reprisal Against Plaintiff / Hostile Work Environment - Supervisor's Refusal To Perform Plaintiff's Annual Performance Review**

Ms. Champion claims that in January of 2018, her direct supervisor and department Accounting Manager, Ms. Harmon, refused to conduct Ms. Champion's Performance Appraisal knowing that the date of her pending resignation was approximately thirty (30) days away in February 2018.  Ms. Champion claims that Ms. Harmon's refusal was in retaliation against Ms. Champion for blowing the whistle on Ms. Harmon's severe breach of USCCB policy and procedure which requires proper reconciliation of Bank of America (BOA) Accounts Payable Invoices (APIs).

Ms. Champion claims that her review of an audit trail revealed that on October 20, 2018, Ms. Harmon repeatedly failed to review the supporting documentation to confirm that the BOA transactions were within USCCB policy.  Thus, Ms. Harmon failed to adhere to generally accepted accounting principles ("GAAP").  Ms. Champion "blew the whistle" on Ms. Harmon's gross breach of USCCB policy and procedure by reporting her actions to CFO Jones on October 24, 2017.  *See* Exhibit __

Ms. Champion claims, based on information, knowledge and belief, that two months after she "blew the whistle," Ms. Harmon and Ms. Unalivia were both allowed to resign (and subsequently left their USCCB positions on the same date in January 2018), instead of being summarily terminated. [14]

## COUNT 5

## 5.  **Defendant Discriminated Against Plaintiff On the Basis of Race.**

---

[14] Nevertheless, USCCB has summarily terminated Ms. Champion who is the whistleblower of USCCB employee deviation from USCCB's Accounting policies and procedures and generally accepted accounting principles (GAAP), in addition to violation of IRS code requirements.

Ms. Champion is a black, African-American, single mother of two (2) children who only has a high school education compared to her direct supervisor, Ms. Acton, who is white, Caucasian, college educated woman in a position of authority over Ms. Champion.  Ms. Champion claims that Ms. Acton (white, Caucasian) demonstrated racial animus towards, and retaliated against, her in September of 2018 when Ms. Acton: 1) presented her with the aforementioned fallacious PIP; 2) refused to provide her with documents supporting the allegations documented in the PIP; 3) decreased her work hours despite work backlog; 4) restricted her badge access to the USCCB building.  Ms. Champion claims that based upon her knowledge, information and belief, it was proper to attempt to file a civil rights complaint against Defendant with the EEOC because of the cumulative experiences she was exposed to by virtue of the conduct of USCCB's employees in positions of authority over her which created an overall hostile work environment for her to work in on a daily basis.  Ms. Acton violated her civil rights by mistreated her because of black skin color and African-American race, harassed her and created a hostile working environment for her to work in.  Ms. Champion went to EEOC on September 28, 2018, and completed an EEOC Inquiry Questionnaire, naming USCCB as her employer and naming Ms. Acton as the person who discriminated against her and created a hostile work environment.[15] Ms. Champion also initiated her search for legal representation. *See* Exhibit ___.

Ms. Champion claims that an EEOC staff person informed her that USCCB was exempt from an EEOC investigation and therefore EEOC could not process her complaint.[16]  Ms.

---

[15] On October 31, 2018, Ms. Champion received an official response from EEOC.

[16] The EEOC staff person refused to accept and process Ms. Champion's EEOC Inquiry Questionnaire, though they did date stamp the document.

Champion then called the EEOC hotline and filed a complaint regarding the rejection of her EEOC Inquiry Questionnaire against USCCB.  On October 31, 2018, EEOC issued Ms. Champion a letter stating that, "religious organizations are exempt from civil right laws under a Ministerial Exemption, established by the U.S. Supreme Court. "As such, if you choose to file a charge of discrimination, your charge will be immediately dismissed."

USCCB, by virtue of receiving tax exemptions, is required to comply with all legal requirements pursuant to section 501(c)(3) of the United States Internal Revenue Service Code ("IRS Code"), including federal laws prohibiting race based discrimination in employment. Pursuant to 42 U.S.C. § 2000e-2 - Unlawful Employment Practices, "[I]t shall be an unlawful employment practice for an employer to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."  Furthermore, "[D]iscrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI." Gratz v. Bollinger, 539 U.S. 244, 305, 123 S. Ct. 2411, 2446, 156 L. Ed. 2d 257 (2003) (citing Alexander v. Sandoval, 532 U.S. 275, 281, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001); United States v. Fordice, 505 U.S. 717, 732, n. 7, 112 S.Ct. 2727, 120 L.Ed.2d 575 (1992); Alexander v. Choate, 469 U.S. 287, 293, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985)).

Ms. Champion claims that Ms. Acton terminated her in retaliation against the Equal Employment Opportunity Commission (EEOC) complaints of racial discrimination and creation of hostile work environment, whistleblower activity (waste, fraud and abuse), all of which Ms.

Champion most recently lodged against Ms. Acton on October 10, 2018, directly to Mr. Davis in Defendant's HR Department.

Ms. Champion claims that during the initial verbal complaint to HR, she requested an official USCCB EEOC complaint form from Mr. Davis so that she could file her complaint in writing. She also requested a copy of her employee contract and job description. Mr. Davis informed Ms. Champion that no such complaint form existed. In response, Ms. Champion requested that she be allowed to have her legal representative in the room with her during any meeting scheduled by HR to discuss the EEOC complaints in detail, and presented Mr. Davis with undersigned counsel's law office letter giving USCCB Notice of Legal Representation. The letter was signed and dated by undersigned counsel on October 11, 2018.

However, Mr. Davis and Ms. Theresa Ridderhoff ("Ms. Ridderhoff"), the USCCB Executive Director of HR, denied Ms. Champion's request to have legal counsel present during the HR meeting. Furthermore, no one from USCCB responded to undersigned counsel's October 11, 2018, Notice of Legal Representation. Finally, when Ms. Champion requested an employee from the Information Technology (IT) Department to give her a printout of her employee badge activity, she was denied access to that information.

## COUNT 6

### 6. Defendant Denied Plaintiff Right To Compensation For Overtime Hours Worked

Ms. Champion claims that during her two (2) year employment at USCCB, she was discouraged by Mrs. Jones from reporting and receiving payment for the overtime hours that she worked (on a daily basis) due to the "budgetary constraints" placed on USCCB by the Catholic Church. Ms. Champion was the only Accounts Payable Clerk in the entire building and was

reportedly doing the work of two (2) people, but was contractually restricted to work only 35 hours a week (seven hours a day).  Thus, USCCB caused Ms. Champion to experience a significant loss in monthly and yearly income, as well as future social security benefits as result of its violation of the federal labor laws as described herein.

The Fair Labor Standards Act of 1938, (FLSA) establishes minimum wage, overtime pay, record keeping, and child labor standards affecting full-time and part-time workers in the private sector and in Federal, State, and local governments.  Pursuant to FLSA, 29 U.S.C. § 207, "no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

Ms. Champion's employment agreement requires her to work a maximum of thirty-five (35) hours a week.  Therefore anytime afterwards is considered overtime.  Ms. Champion claims that her mandated workload required her to work more than forty (40) hours per week.  USCCB would force Ms. Champion to clock out and ordered back to her desk to suffer through additional work hours, often times told to return to the building after school pickup and work into the late evening and late night hours, depending upon the work load or backlog of invoices to be paid.  In return, USCCB refused to pay Ms. Champion overtime wages (time and a half) for work done beyond her contracted thirty-five (35) hour per week schedule, in violation of FLSA.

Furthermore, according to WH Publication 1312, Regulations Part 785: Hours Worked, of the United States Department of Labor Wage and Hour Division (Reprinted May 2011), 29 CFR

§ 785.11, "Work not requested but suffered or permitted is work time...The reason is immaterial.

The employer knows or has reason to believe that [s]he is continuing to work and the time is

working time.  (Handler v. Thrasher, 191, F.2d 120 (C.A. 10, 1951); Republican Publishing Co.

v. Ameican Newspaper Guild, 172 F. 2d 943 (C.A. 1, 1949; Kappler v. Republic Pictures Corp.,

59 F. Supp. 112 (S.D. Iowa 1945), aff'd 151 F. 2d 543 (C.A. 8, 1945); 327 U.S. 757 (1946);

Hogue v. National Automotive Parts Ass'n. 87 F. Supp. 816 (E.D. Mich. 1949); Barker v.

Georgia Power & Light Co., 2 W.H. Cases 486; 5 CCH Labor Cases, para. 61,095 (M.D. Ga.

1942); Steger v. Beard & Stone Electric Co., Inc., 1 W.H. Cases 593; 4 Labor Cases 60,643

(N.D. Texas, 1941))" [17]

## <u>COUNT 7</u>

**7.  <u>Defendant Violated Plaintiff's Right To Family Leave, Medical Leave and Privacy of
Health Information.</u>**

The Family Medical Leave Act of 1993 ("FMLA") applies to private employers such as

USCCB.  FMLA applies to those employers who employed 50 or more employees for at least 20

work weeks during either this year (2018) or the previous year (2017).  FMLA is a federal labor

law requiring covered employers to provide employees with job protection and unpaid leave for

qualified medical and family reasons. These include pregnancy, adoption, foster care placement

of a child, *personal or family illness*, or family military leave.  USCCB is a private corporation

that engages in, or affects, interstate commerce in the United States and employs over three

hundred (300) employees on an annual basis.  Thus, USCCB is a covered employer that is

required to comply with the requirements of FMLA.  Ms. Champion is a full-time USCCB

---

[17] *See* https://www.dol.gov/whd/regs/compliance/wh1312.pdf, § 785.11.

employee who has worked for USCCB for two (2) years.  Thus, she is a protected employee pursuant to FMLA.

Furthermore, District of Columbia Code § 32-502. Family Leave Requirement, states that, "An employee shall be entitled to a total of 16 workweeks of family leave during any 24-month period for...[t]he care of a family member of the employee who has a serious health condition...[S]ubject to the requirements of subsection (h) of this section, *in the case of a family member who has a serious health condition, the family leave may be taken intermittently when medically necessary*," (emphasis added).[18]  Furthermore, the Parental Leave Act of 1994 (PLA), D.C. Code §§ 32-1201 – 1206, provides that employees who are parents, guardians or otherwise responsible for a child with a total of 24 hours of leave during any 12-month period to attend or participate in school-related events for the child (or children). [19]

Ms. Champion claims that on several occasions after she had requested leave for medical procedure or follow-up appointments to be evaluated and treated serious health conditions, (i.e., diabetes and hypertension), Ms. Rodriguez or Ms. Acton would either grant it and ask her to work remotely off the clock, or grant it and subsequently pressure Ms. Champion to cancel her appointments in order to address the backlog of work.  On one occasion, Ms. Acton inquired, "Do you have to go to your doctor's appointment?  Is it an emergency?"  Such questions are violations of the HIPAA Privacy Rule, supra.  Ms. Champion also claims that over the past four (4) months, when she personally requested sick leave or requested leave to attend her daughter's

---

[18] *See* DC Code §32-502 (a)(c).

[19] The Parental Leave Act of 1994 states that, Employers may only deny the leave if it would disrupt the employer's business, making production or service delivery unusually difficult. The leave will be unpaid unless the employee uses paid leave provided by the employer. The employee must notify the employer at least 10 days prior to the event unless it is unforeseeable.

parent-teacher conference, school activity, or pediatrician's appointment, Ms. Acton would

penalize her for the work that had not been done on those particular days.

For example, Ms. Champion claims that during the first week of October 2018, Ms.

Champion's minor child ("child") suffered a serious health condition (severe orthopedic injury)

which required her to wear a full body cast for six (6) weeks.  The child became partially

disabled (temporarily) and was unable to ambulate independently without the use of two (2)

crutches.  The child also required the assistance of her mother [Ms. Champion] with activities of

daily living (ADLs).  During the child's period of recovery, USCCB reprimanded  Ms.

Champion's decision to take leave to attend her daughter's unforeseeable or urgent appointments

related to her daughter's severe injury, including an urgent parent-teacher conference at the

child's school where issues concerning the child's disability were on the agenda to be discussed.

Ms. Champion claims that Ms. Acton, in retaliation against Ms. Champion for taking

leave, created another PIP and demanded an unscheduled performance evaluation which

included the time period within which Ms. Champion was absent from work.  During that time,

Ms. Acton and Ms. Rodriguez claimed that Ms. Champion demonstrated "poor performance" for

that period which did not take into account the fact that Ms. Acton restricted Ms. Champion's

daily work schedule to only 8:00 a.m to 4:00 p.m. daily (regardless of leave time taken for

doctor's appointments and school meetings) and restricted her badge access to USCCB premises

(without notice or explanation) which caused Ms. Champion public humiliation and

embarrassment when the security officer denied her entry in the presence of other USCCB

employees), and revoked her remote access to the USCCB computer software program (without

notice or explanation).  Ms. Champion claims that Defendant's deliberate and surreptitious

actions against Ms. Champion eliminated Ms. Champion's ability to effectively work through her backlog and achieve the September 2018 PIP goals established and monitored by Ms. Rodriguez and Ms. Acton.

Thus, Ms. Champion claims that USCCB violated her rights pursuant to FMLA, DCFMLA and PLA and created a *false* impression that her work performance failed to meet minimum standards.  Ms. Champion claims that the misleading language and inaccuracies contained in the PIP was designed as a *deterrent* from taking time off from work and an opportunity for Ms. Acton to leave a "stain" in Ms. Champion's *satisfactory* work record to be used against her in the event that Ms. Champion ever decided to resign or in the event that Ms. Acton decided to terminate Ms. Champion (which she eventually did in November 2018).

## COUNT 8

### 8. Defendant Wrongfully Terminated Plaintiff

On November 6, 2018, Ms. Champion arrived to work only to discover that her access badge was deactivated.  On November 7, 2018, Ms. Acton transmitted a USCCB Letter of Termination to Ms. Champion, giving notice of Ms. Champion's right to request an Administrative Review of decision to terminate.

On November 9, 2018, Plaintiff's counsel submitted a timely *Request For Administrative Review* on Plaintiff's behalf and attached Ms. Champion's personal statement in protest of Ms. Acton's fallacious grounds for dismissal, as well as supporting documents demonstrating Ms. Champion's claims of discrimination, harassment/hostile work environment, nonpayment of wages (overtime), denial of leave, workplace bullying/retaliation, and wrongful termination.

Undersigned counsel also gave USCCB notice of Ms. Champion intent to file a civil action against USCCB for damages in federal court.  In response, Defendant refused to schedule a meeting between Ms. Champion (a Washington, DC USCCB employee) and the "director of her office, department or secretariat and the Director of the Office of Human Resources, to have such action [termination of employment]  reviewed," per Policy #2-E (Termination of Employment), Section 4 (Administrative Review) of Defendant's Personnel Policies and Procedures Manual (February 2018) ("Policy 2-E").

Instead of allowing Ms. Champion to participate in the *Administrative Review* of the termination of her employment per the guidelines of USCCB's personnel manual, Defendant transmitted a letter (referred to as a "memo") to Ms. Champion, on November 20, 2018, stating that, "the Conference ha[d] reviewed the circumstances regarding...termination and found no reason to reverse the decision."  If this court accepts Defendant's assertions that it conducted an "official" *Administrative Review* of all Ms. Champion's claims, then this court would also have to accept that Defendant failed to question Ms. Champion during such a *review* in the face of very serious allegations of employee *civil and labor rights violations*.[20] Thus, Ms. Champion claims that Defendant intentionally failed to conduct a fair and unbiased review of (and investigation into) her claims of civil and labor rights violations.

Interestingly, Defendant did not state in its November 20th letter to Ms. Champion that it either contracted with a third-party, Equal Employment Opportunity (EEO) Investigator (or

---

[20] Ms. Champion's claims of racial discrimination / hostile work environment, denial of vacation and leave time (medical and family), nonpayment of overtime wages, workplace bullying, retaliation for whistleblower activity and wrongful termination were clearly outlined in her November 9, 2018, request for Administrative Review of Defendant's termination of her employment as Accounts Payable Clerk.

delegated the task to an internal EEO officer) to "investigate" Ms. Champion's claims; Nor did

Defendant provide Ms. Champion with a copy of any written documentation listing the questions

posed and answers received from the accused parties and witnesses (i.e. affidavit statements).

Thus, Ms. Champion claims that in addition to violating her *civil rights* on the bases of

color and race, Defendant also violated her *due process rights* when it excluded Ms. Champion

from the *Administrative Review* process which was promised to her as a full-time employee

pursuant to the provisions documented by USCCB in Policy #2-E of its 2018 Personnel Policies

and Procedures Manual ("Personnel Manual").  Ms. Champion's due process and civil rights are

guaranteed and protected pursuant to the Due Process and Equal Protection Clauses of the Fifth

and Fourteenth Amendments to the U.S. Constitution, by incorporation.

**WHEREFORE**, Plaintiff prays this Court will grant her the relief she is seeking,

specifically, compensatory and punitive damages in the amount of $3,000,000.00 ($3M), the

expungement of the termination as "reason for leaving" from her USCCB personnel record, and

USCCB hiring of additional personnel needed to manage and maintain the workload of the AP

Clerk position to prevent the unreasonable and inhumane work overload created by the current

conditions.

Dated: December 22, 2018                              Respectfully Submitted,

/s/ *Monique A. Tovar*

Monique A. Tovar, RN, JD
DC Bar No. 1016038
The Law Office of Monique A. Tovar, PLLC
1725 I Street NW, Suite 300
Washington, DC 20006
O: (202) 729-8726
C: (202) 997-0217
F: (202) 349-3915
monique@moniquetovarlaw.com
moniquetovarlaw@gmail.com

***Counsel for Plaintiff***